# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

JAMES K. SHORT,

                   Plaintiff,

     v.

UNITED STATES OF AMERICA,

                   Defendant.

Case No. 3:10-cv-00248-SLG

## **MEMORANDUM OF DECISION**

### INTRODUCTION

This is an action brought against the United States pursuant to the Federal Tort Claims Act.[1] The Complaint was filed in November 2010,[2] and relates to medical care that was provided to Plaintiff James Short by the Bureau of Prisons in December 2007. Mr. Short seeks an award of damages of $500,000.[3]

This matter was reassigned to the undersigned judge in January 2012. A six-day bench trial was held in early May 2012.

Federal Rule of Civil Procedure 52(a) provides that "[i]n an action tried on the facts without a jury . . . the Court must find the facts specially and state its conclusion of

---

[1] 28 U.S.C. § 2671 *et seq.*

[2] Docket 1.

[3] Although the Complaint alleges malpractice throughout the entire period of Mr. Short's incarceration at the BOP, at trial Mr. Short focused on the care provided to him in December 2007. Also, although the Complaint included a claim for damages for lost wages and medical expenses, at closing argument Mr. Short's counsel clarified that Mr. Short was seeking only noneconomic damages associated with the delayed diagnosis and the fact that Mr. Short underwent chemotherapy.

law separately." Having considered the testimony of the witnesses, the exhibits admitted into evidence, and the arguments of counsel, this Court now makes the following Findings of Fact and Conclusions of Law as set forth below.

## FINDINGS OF FACT

1. A total of fourteen witnesses testified at the trial.

2. In addition to himself, Mr. Short called the following witnesses: Louis Shicker M.D., who provided expert testimony; Heather Gardner; Renee Lynn Bond; Reid Stratton; Angela Marie Strahan; Janice Short; Francis Leland Jones, M.D.; Albert Joseph DiVittorio, M.D.; and Steven Liu, M.D.

3. The United States called the following witnesses: Jennifer Ashley Ramsey; David W. Keene; Shawn Adele Roberts, who provided expert testimony; and Sam Whiting, M.D., who provided expert testimony.

4. Many documents were admitted into evidence, most of which consisted of Mr. Short's medical records.[4]

5. Plaintiff Short was the first witness to testify at trial. He testified that he was in good shape when he entered the federal prison system in early 2007, indicating he could bench press 405 pounds, and worked out three to four days per week.[5] But he also testified that he had injured his shoulder in a car accident in Hawaii in approximately 2000, had surgery on it in 2004, and that it was quite painful while he was

---

[4] *See* Docket 54.

[5] Docket 48 at 39 (Tr. 5/6/13). Medical records indicate that Mr. Short weighed 218 pounds in January 2007, shortly before he arrived at Sheridan. Ex. 1 at 23.

in Sheridan.[6]  Mr. Short testified that he frequently sought medical treatment from the physician assistants (PAs) in Sheridan for his shoulder, and asked and obtained from them documentation that would identify him as ineligible for work due to the shoulder injury.[7]  Mr. Short also testified that he never had an office visit longer than five minutes with any PA while at Sheridan.[8]

6.     Mr. Short testified that he first experienced rectal bleeding about two or three weeks before he first reported it to PA Keene on December 18, 2007.[9]  At that visit, Mr. Short indicated that his shoulder was his highest priority because it was very painful.[10]  With regard to the rectal bleeding, Mr. Short testified that PA Keene told him at that visit that "at his age, it's most likely hemorrhoids."[11]  He testified that PA Keene had told him to get hemorrhoid cream from the commissary and to return to the clinic if the condition persisted.[12]  Mr. Short testified that he repeatedly told PA Keene at that visit that he thought he had Crohn's disease.[13]

---

[6] Docket 48 at 33, 40, 182 (Tr. 5/6/13).  Mr. Short is not making any claim against the government with respect to the health care treatment of his shoulder while at Sheridan.  *See* Docket 48 at 70 (Tr. 5/6/13).

[7] Docket 48 at 56 (Tr. 5/6/13).

[8] Docket 48 at 55 (Tr. 5/6/13).

[9] Docket 48 at 62 (Tr. 5/6/13).

[10] Docket 48 at 63 (Tr. 5/6/13).

[11] Docket 48 at 87 (Tr. 5/6/13).

[12] Docket 48 at 196 (Tr. 5/6/13).

[13] Docket 48 at 95, 198 (Tr. 5/6/13).  At his deposition, Mr. Short had testified that when he met with PA Keene, "I knew it wasn't hemorrhoids because I know what hemorrhoids are;" (Docket 48 at 201 (Tr. 5/10/13).

7. Although Mr. Short indicated he told the PA that he also had pain higher up in his abdomen, Mr. Short testified that PA Keene seemed unconcerned about that.[14] And Mr. Short testified that PA Keene did not ask to perform a digital rectal exam.[15] He added that if he had been offered that exam, he would have consented to it. Mr. Short agreed that it would have been unreasonable for him to have refused that exam if it had been offered to him.[16] Mr. Short also testified that PA Keene did not tell Mr. Short that cancer could cause rectal bleeding.[17]

8. On cross examination, the government introduced multiple requests for medical treatment and other forms from Sheridan, which all appear to have been completed by, or based on information from, Mr. Short. Apart from the record of December 18, 2007, none of the Sheridan records identifies any issue with rectal bleeding.[18]

9. Although at times Mr. Short testified at trial that he may have told the PAs at Sheridan about rectal bleeding prior to the December 18, 2007 visit, this Court finds that Mr. Short's testimony that he first apprised medical staff at Sheridan about the bleeding on December 18, 2007 to be his most credible testimony on this topic.[19] Likewise,

---

[14] Docket 48 at 90 (Tr. 5/6/13).

[15] Docket 48 at 89 (Tr. 5/6/13).

[16] Docket 48 at 195 (Tr. 5/6/13).

[17] Docket 48 at 94 (Tr. 5/6/13).

[18] Docket 48 at 182, 202-03 (Tr. 5/6/13); Ex. A at 107, 128, 135, 138, 142, 145, 152, 153, 158, 161.

[19] *Cf., e.g.*, Docket 48 at 97, 109, 110 (Tr. 5/6/13); Docket 49 at 15-16 (Tr. 5/7/13). See also Ex. X at 49, in which Mr. Short describes with particularity his concerns regarding his Ibuprofen prescription in August 2007, but does not mention rectal bleeding.

although at times Mr. Short testified at trial that he had experienced rectal bleeding and pain in his abdomen throughout his entire stay at Sheridan, this Court was thoroughly persuaded by his testimony at trial that he did not experience rectal bleeding until a few weeks before he reported it to PA Keene on December 18, 2007, and that he did not experience abdominal pain while at Sheridan.[20] Not only did Mr. Short's demeanor and the nature of his testimony at trial support these findings, but these findings are also fully consistent with the medical records introduced at trial.

10. Mr. Short left Sheridan in February 2008 and went to the Cordova Center, a halfway house. Mr. Short testified that he had regular episodes of rectal bleeding while at Cordova.[21] At trial, he indicated that he never told his case manager, Jennifer Ramsey, about his rectal bleeding at any time during the approximate six months he was at the halfway house. He testified he "didn't care about the bleeding" at that time; resolving the custody issues with his son was his priority.[22] Also, he had diagnosed himself as having Crohn's disease.[23]

11. On August 5, 2008, shortly after Mr. Short had left the halfway house, he visited Dr. Leland Jones. Mr. Short explained that the purpose of the visit was to obtain a

---

[20] *Cf., e.g.*, Docket 48 at 109-10, 172. Mr. Short also testified at trial that he had not told anyone at Sheridan about the bleeding until he went to see PA Keene about it; he also indicated that had told his mother about it on the phone. *See* Docket 48 at 62 (Tr. 5/6/13).

[21] Docket 48 at 207 (Tr. 5/6/13).

[22] Docket 48 at 114 (Tr. 5/6/13). *But cf.* Docket 48 at 211-12 (presenting Mr. Short's deposition testimony where he repeatedly stated that he had told Ms. Ramsey of the blood in the stool).

[23] Docket 48 at 114 (Tr. 5/6/13).

prescription for Vicodin, a pain killer, due to pain from Mr. Short's shoulder.[24] The medical history questionnaire for that visit did not mention abdominal pain or rectal bleeding, but only shoulder pain and erectile dysfunction.[25] At trial, Mr. Short testified that at the time of that visit, he "still had some stomach pains" and "still had some bleeding," but was not yet experiencing rapid weight loss – "I wasn't on my death bed that day."[26]

12. Later that same month, Mr. Short visited another doctor because he was concerned that the swelling in his left testicle could be cancer.[27] He acknowledged that he had been offered a digital rectal exam at that visit but had declined that procedure, stating "all I need is a sonogram that you guys are going to give to me" and "I'm not here for any of that, I'm just here to check my testicle."[28] Medical records from that visit also indicate that Mr. Short then indicated that he had no abdominal pain.[29] Mr. Short testified that the doctor did feel at least part of his stomach area.[30]

13. Later in 2008, Mr. Short testified that he became quite sick, with weight loss, abdominal pain, and rectal bleeding.[31] He next sought medical attention on March 25,

---

[24] Docket 48 at 118-19, 121 (Tr. 5/6/13).

[25] Docket 48 at 223; Ex. A at 194.

[26] Docket 48 at 227 (Tr. 5/6/13).

[27] Docket 48 at 121, 124 (Tr. 5/6/13).

[28] Docket 48 at 130-31 (Tr. 5/6/13).

[29] Ex. A at 198.

[30] Docket 48 at 231 (Tr. 5/6/13).

[31] Docket 48 at 120, 141 (Tr. 5/6/13).

2009, when he returned to Dr. Leland Jones.[32] Dr. Jones performed a digital rectal exam, which was negative.[33] After further testing, Mr. Short was diagnosed with colon cancer. He underwent surgery as well as extensive chemotherapy.[34] Although he indicated he is now cancer-free, he has developed neuropathy, meaning the tips of his fingers and toes are very cold sensitive.[35]

14.  In 2012, a benign mass was discovered at the same site as Mr. Short's cancer, which has required additional surgeries and which Mr. Short testified is still causing him considerable pain and tenderness.[36]

15.  Mr. Short presented the testimony of Louis Shicker, M.D., who was qualified as an expert in internal medicine.[37] Dr. Shicker opined that the care provided to Mr. Short with respect to his rectal bleeding complaint on December 18, 2007 was "totally inadequate."[38] He explained that the limited history that was taken failed to meet the standard of care.[39] He noted that the medical record indicated that a digital rectal exam had been refused, but he identified other aspects of a physical exam that he opined

---

[32] Docket 48 at 132 (Tr. 5/6/13).

[33] Docket 48 at 143 (Tr. 5/6/13); Ex. 2 at 312.

[34] Docket 48 at 154 (Tr. 5/6/13).

[35] Docket 48 at 155-56 (Tr. 5/6/13).

[36] Docket 48 at 164, 169, 170 (Tr. 5/6/13).

[37] Docket 56 at 12 (Tr. 5/7/13).

[38] Docket 56 at 18 (Tr. 5/7/13).

[39] Docket 56 at 21 (Tr. 5/7/13).

should have been performed but were not noted on the medical record.[40] He also testified that when an exam is refused, a refusal form should be completed, particularly in the correctional setting.[41] Dr. Shicker testified that the standard of care, and BOP procedure, requires medical staff to explain to an inmate who complains of rectal bleeding but refuses a rectal exam that a possible reason for the rectal bleeding is cancer of the colon, adding "[i]f patients go away from the visit thinking you are not concerned about potential problems, they would tend not to worry and not seek further care for them."[42] He further opined that if the appropriate procedures had been followed, then Mr. Short's cancer "would have been found earlier."[43] And, he added, the earlier treatment of cancer increases the likelihood of a cure.[44]

16. On cross examination, Dr Shicker acknowledged that Mr. Short should have returned to the clinic had he continued to have further episodes of rectal bleeding.[45] He also acknowledged that Mr. Short should have reported rectal bleeding to Cordova Center personnel had he had episodes at that time, although he added that "his initial complaints were not really taken seriously and so the benefit that he may have gotten from reporting them may have been somewhat questionable to him."[46] Likewise, Dr.

---

[40] Docket 56 at 23 (Tr. 5/7/13).

[41] Docket 56 at 26 (Tr. 5/7/13); *see also* Ex. 14 at 2054.

[42] Docket 56 at 38 (Tr. 5/7/13).

[43] Docket 56 at 40-41 (Tr. 5/7/13).

[44] Docket 56 at 57 (Tr. 5/7/13).

[45] Docket 56 at 77 (Tr. 5/7/13).

[46] Docket 56 at 78 (Tr. 5/7/13).

Shicker acknowledged that after Mr. Short left the Cordova Center, he should have sought medical care if he had additional episodes of rectal bleeding.[47]

17. Mr. Short's next witness was Heather Gardner, who testified by telephone. Ms. Gardner is an attorney who represented Mr. Short in a custody matter beginning in 2006.[48] Ms. Gardner testified that Mr. Short told her both about his shoulder problems, and "later in the time . . . that he was at Sheridan, he had mentioned that – he talked about the rectal bleeding."[49] Ms. Gardner added that Mr. Short had told her he had been told to use cream, but that "he didn't think he was diagnosed or treated adequately."[50] She added that soon after these conversations, he left Sheridan.[51] Her testimony further supports this Court's finding that Mr. Short did not have any rectal bleeding until approximately December 2007.

18. Mr. Short next called Renee Alynn Bond, who testified that she regularly spoke to Mr. Short by telephone when he was at Sheridan.[52] Her recollection of dates and specifics was imprecise, which is not unusual for a witness. But the Court found her testimony too vague to be helpful or reliable.

19. Mr. Short next called Reid Stratton, who indicated he was a longtime friend of Mr. Short. He testified that he spoke to Mr. Short "just sparsely" when Mr. Short was

---

[47] Docket 56 at 78 (Tr. 5/7/13).

[48] Docket 56 at 86 (Tr. 5/7/13).

[49] Docket 56 at 92 (Tr. 5/7/13).

[50] Docket 56 at 99 (Tr. 5/7/13).

[51] Docket 56 at 94 (Tr. 5/7/13).

[52] Docket 56 at 111 (Tr. 5/7/13).

incarcerated.[53] He added that Mr. Short spoke to him about "a hemorrhoid at one point"[54] during his incarceration. Mr. Stratton testified that after Mr. Short had left Sheridan and was back in Anchorage, the only explanation Mr. Short had for his health problems was that he had hemorrhoids, since he had been informed that he had hemorrhoids by the prison's doctor.[55] This Court rejects this testimony, as it is flatly inconsistent with Mr. Short's own often repeated testimony that he believed he had Crohn's disease.

20.     Mr. Short next called his fiancée Angela Marie Strahan, who described her observations of Mr. Short's medical issues that arose in late December 2011 and the considerable support she provided to him thereafter.

21.     Mr. Short's mother, Janice Short, also testified. She indicated that within a couple of months of his arrival at Sheridan, Mr. Short was complaining to her "that he was bleeding from his rectum and that he had a horribly bad stomach ache."[56] Ms. Short was not any more precise on the dates, and this Court was not persuaded by her testimony that the rectal bleeding may have begun sooner than approximately December 2007. Ms. Short testified that she told her son "to go to the doctor there at the Sheridan penitentiary."[57] After that, Ms. Short indicated that her son told her he had

---

[53] Docket 56 at 128 (Tr. 5/7/13).

[54] Docket 56 at 130 (Tr. 5/7/13).

[55] Docket 56 at 136 (Tr. 5/7/13).

[56] Docket 56 at 169 (Tr. 5/7/13).

[57] Docket 56 at 169 (Tr. 5/7/13).

gone to medical, and that "he had been prescribed an ointment for hemorrhoids from the doctor and that was the only treatment he received for that."[58] Ms. Short also indicated that she told her son "that maybe he had Crohn's."[59] She added that she "never said the word 'cancer' to him," but that was her fear.[60] Ms. Short said she met her son at the airport when he returned to Anchorage from Sheridan, and he still had health problems. She indicated she encouraged her son to go see a doctor, but "he did not go."[61]

22. Dr. Leland Jones also testified at the trial. He is a retired general practitioner who treated Mr. Short. He indicated that he had only a vague recollection of Mr. Short apart from the medical records.[62] Those records indicate that in August 2008, Dr. Jones prescribed Viagra and Vicodin to Mr. Short.[63] Mr. Short did not report hemorrhoids, other bowel disease, or rectal bleeding to Dr. Jones in the medical questionnaire that was completed at that time.[64]

---

[58] Docket 56 at 171 (Tr. 5/7/13).

[59] Docket 56 at 172 (Tr. 5/7/13).

[60] Docket 56 at 172 (Tr. 5/7/13).

[61] Docket 56 at 177 (Tr. 5/7/13).

[62] Docket 57 at 5 (Tr. 5/8/13).

[63] Ex. 2 at 315-16.

[64] Ex. 2 at 317. Mr. Short's weight at that time was listed as 204 pounds. *See also* Docket 57 at 22-23 (Tr. 5/8/13).

23. Dr. Jones testified that Mr. Short returned to see him in March 2009, and identified his complaint at that time as abdominal pain and bloody stools.[65] A colonoscopy was performed on April 17, 2009, which demonstrated a tumor in the colon that was later determined to be cancerous.[66]

24. Mr. Short's next witness at trial was Albert J. DiVittorio, M.D., a general surgeon in California who operated on Mr. Short in May 2012.[67] Although Dr. DiVittorio had suspected a recurrence of the colon cancer, subsequent surgery indicated that the adhesions that had developed in the colon at that time were benign.[68] The doctor also noted that the location of Mr. Short's tumor "was considerably higher" up the colon than would be discernible with a digital rectal exam.[69]

25. Steve Lui, M.D. was Mr. Short's final witness. He is an oncologist who provided medical care to Mr. Short after his surgery beginning in May 2009.[70] Dr. Lui discussed the pathology report, which had indicated that Mr. Short had had a stage II tumor, with a prognosis that is "often times fairly good," but Dr. Lui added there are "perhaps 15 up to 30 percent of patients . . . with stage II disease who may relapse within the next five to 10 years."[71] Dr. Lui informed Mr. Short that if he opted for chemotherapy, it could

---

[65] Ex. 2 at 310. Mr. Short's weight at that time was listed as 200 pounds.

[66] Ex. 2 at 300.

[67] Docket 57 at 35 (Tr. 5/8/13).

[68] Docket 57 at 59 (Tr. 5/8/13).

[69] Docket 57 at 63 (Tr. 5/8/13).

[70] Docket 57 at 70 (Tr. 5/8/13).

[71] Docket 57 at 71-72 (Tr. 5/8/13).

improve his chances of not getting the cancer back somewhere between 5 and 10 percent, and he recommended chemotherapy for that reason.[72] Mr. Short followed Dr. Lui's recommendation for chemotherapy. As of the time of trial, he was cancer-free.

26. The government's first witness was Jennifer Ramsey, Mr. Short's case manager at the Cordova Center after he left Sheridan in February 2008.[73] On the intake form that Mr. Short completed with Ms. Ramsey, the only special medical problem he indicated was with respect to his shoulder.[74] Ms. Ramsey also testified that she had no recollection of Mr. Short ever coming to her with a complaint about rectal bleeding.[75] Nor is any such complaint in the Cordova Center's records introduced into evidence at trial. Ms. Ramsey also explained that residents at the Cordova Center had the ability to obtain non-emergency medical care at the Anchorage Neighborhood Health Center. Medical records indicate that Mr. Short went to ANHC for medication for his shoulder in February 2008, shortly after he arrived at the Cordova Center.[76]

27. David Keene, the PA who treated Mr. Short on December 18, 2007 at Sheridan, was the government's next witness. He testified telephonically, and indicated he did not recall Mr. Short as a patient to whom he had provided care and thus testified only from

---

[72] Docket 57 at 76-77 (Tr. 5/8/13).

[73] Docket 57 at 87 (Tr. 5/8/13).

[74] Docket 57 at 90 (Tr. 5/8/13); Ex. E at 1.

[75] Docket 57 at 104 (Tr. 5/8/13).

[76] Ex. A at 521.

the medical records.[77] He indicated that it would have been standard practice for him to explain to a patient why he sought to do a digital rectal exam, although he could not recall with respect to Mr. Short specifically if he had followed that standard practice.[78] He indicated that he would have thought Mr. Short's rectal bleeding was caused by hemorrhoids given Mr. Short's relatively young age and very low risk for more serious conditions.[79] He also added that if Mr. Short had told him about abdominal pain or episodes of bloody mucous and red-veined blood in his stool that it would have been the PA's practice to note that on the chart, but no such notations were made on the chart for Mr. Short's December 18, 2007 visit.[80] Likewise, PA Keene testified that if Mr. Short had reported to him at any time that he thought he had Crohn's disease, the PA would have noted that on the chart as well.[81] PA Keene added that if Mr. Short had returned with complaints of further rectal bleeding, the PA would have gone in more depth about Mr. Short's history and the complaint, and referred him to the physician for additional care.[82] PA Keene also indicated in his testimony on cross-examination that when an individual refuses a test, such as a digital rectal exam, that it would be important to tell the patient about the risks of not doing the exam and to document on

---

[77] Docket 58 at 18 (Tr. 5/9/13).

[78] Docket 58 at 37 (Tr. 5/9/13).

[79] Docket 58 at 39 (Tr. 5/9/13)

[80] Docket 58 at 34 (Tr. 5/9/13).

[81] Docket 58 at 41 (Tr. 5/9/13).

[82] Docket 58 at 43 (Tr. 5/9/13).

the record that the patient had been so informed.[83] And in response to questions as to the limited scope of questions that the PA posed to Mr. Short about the rectal bleeding, PA Keene repeatedly indicated that he would have planned for a more detailed inquiry in the event that Mr. Short returned with the same complaint unresolved, as instructed.[84] PA Keene explained that he tends to rule out what are the most common causes for a problem, which in the case of rectal bleeding are "hemorrhoids, constipation, [and] diarrhea," and then "work the list down."[85] Based upon the testimony of PA Keene and the medical records of the December 18, 2007 visit, as well as the medical records of Mr. Short's visit in August 2008 with a different doctor where he declined the same test, this Court finds it more likely than not that PA Keene offered to perform a digital rectal exam of Mr. Short on December 18, 2007, but that Mr. Short refused.

28.  The government next called Shawn Adele Roberts as a witness. Ms. Roberts is a family nurse practitioner and was qualified as an expert in family practice, primary and urgent care in a health clinic setting, and the diagnosis and treatment of patients.[86] She testified that PA Keene did not breach the medical standard of care in the care he provided to Mr. Short on December 18, 2007. Instead, she opined that he appropriately responded to Mr. Short's complaint of rectal blood at that visit.[87] It was significant to her

---

[83] Docket 58 at 94 (Tr. 5/9/13).

[84] Docket 58 at 108-12 (Tr. 5/9/13).

[85] Docket 58 at 115, 132 (Tr. 5/9/13).

[86] Docket 59 at 19 (Tr. 5/10/13).

[87] Docket 59 at 13 (Tr. 5/10/13).

in that regard that Mr. Short's medical records reflected that he had made only that one complaint of rectal bleeding while at Sheridan, because a single episode is more likely to be a hemorrhoid.[88] And she indicated that if a patient refused a digital rectal exam, then she would instruct the patient to return if the bleeding continued.[89] She added that she "would not consider colon cancer in a healthy 37-year-old male who presents with the classic symptoms of hemorrhoids."[90] And she would not tell a patient with what appeared to be a common problem such as hemorrhoids about what the other possibilities were, and particularly would avoid reference to the term cancer when a patient is making an initial complaint about a symptom.[91] She also stressed that PA Keene's note of the December 18, 2007 visit indicated that Mr. Short complained of blood on the tissue paper, and not in the stool or in the toilet, even though Mr. Short had written that the blood was in his stool on the sick call sign-up sheet, which PA Keene had noted he had read.[92] Ms. Roberts indicated it is not uncommon for a patient to give different information on an intake from what is provided in response to questions from the treatment provider.[93] She also explained that a digital rectal exam is not a

---

[88] Docket 59 at 14 (Tr. 5/10/13).

[89] Docket 59 at 19 (Tr. 5/1013).

[90] Docket 59 at 21 (Tr. 5/10/13).

[91] Docket 59 at 56, 68 (Tr. 5/10/13).

[92] Docket 59 at 58-59 (Tr. 5/10/13).

[93] Docket 59 at 85 (Tr. 5/10/13).

particularly useful diagnostic test because there can be false-positives and false-negatives with it.[94]

29. This Court finds that the testimony of Ms. Roberts as to the standard of care to be more persuasive than the testimony of Dr. Shicker on this topic. Given Mr. Short's age and the nature and initial presentation of the rectal bleeding symptom, PA Keene did not breach the standard of care when he offered Mr. Short a digital rectal exam, recommended that he try hemorrhoid cream, and instructed him to return to the clinic if the symptom persisted.

30. The government's final witness was Sam Whiting, M.D., a medical oncologist.[95] Dr. Whiting was qualified as an expert in the areas of the symptoms and diagnosis of colon cancer, the risk factors for colon cancer, the diagnostic testing for colon cancer, and the treatment of colon cancer.[96] He testified that the incidence of colon cancer in patients in Mr. Short's age group was roughly five cases per 100,000 people, or .005 percent.[97] Dr. Whiting added that he had reviewed Mr. Short's family history, and there

---

[94] Docket 59 at 67, 69 (Tr. 5/10/13).

[95] Docket 59 at 112 (Tr. 5/9/13). Prior to Dr. Whiting's testimony, the Court granted the government's Rule 51 motion for partial judgment, and held that Mr. Short had not presented sufficient evidence that the nature and scope of Mr. Short's surgery would have been different (i.e., would not have included the removal of a portion of the small intestine) or that Mr. Short's chance of complete recovery would have exceeded his current 90% or more chance of recovery had the cancer been diagnosed in December 2007. This ruling did not preclude Mr. Short from making a claim that he would not have had pain and suffering from the bowel obstruction and would not have had to undergo chemotherapy had the cancer been diagnosed in December 2007. Docket 59 at 91-110 (Tr. 5/10/13).

[96] Docket 59 at 117 (Tr. 5/10/13).

[97] Docket 59 at 118 (Tr. 5/10/13).

was nothing in that history that altered his probability of having colon cancer.[98] On cross examination, he added that rectal bleeding "has a very poor probability of telling you as a doctor that somebody has cancer."[99]

## CONCLUSIONS OF LAW

1.  The Federal Tort Claims Act provides that the law of the forum state applies to tort claims against the United States.[100] In this case, the law of the state of Oregon applies, as Mr. Short was at a BOP facility in Sheridan, Oregon at the time of the alleged malpractice.

2.  Under Oregon law, professional negligence is "the failure to meet the standard of care used in the reasonable practice of care in the community."[101] "When a physician-patient relationship exists, the doctor has a duty to exercise 'that degree of care, knowledge and skill ordinarily possessed and exercised by the average provider of that type of medical service.'"[102]

3.  In order to find that a plaintiff is entitled to recover, the plaintiff must plead and prove that it is more likely true than not true that:

    a. a duty runs from the defendant to the plaintiff;

    b. a breach of that duty;

---

[98] Docket 59 at 119 (Tr. 5/10/13).

[99] Docket 59 at 123 (Tr. 5/10/13).

[100] 28 U.S.C. § 2674.

[101] *Son v. Ashland Cmty. Healthcare Servs.*, 244 P.3d 835, 841 (Or. Ct. App. 2010) (quoting *Delany v. Clifton*, 41 P.3d 1099, 1103 (Or. Ct. App. 2002)).

[102] *Son*, 244 P.3d at 841 (quoting *Curtis v. MRI Imaging Servs. II*, 956 P.2d 960, 962 (Or. 1998)).

> c. a resulting harm to the plaintiff measurable in damages; and
>
> d. a causal link between the breach and the harm.[103]

4. Oregon law also provides that "[c]ontributory negligence shall not bar recovery in an action by any person . . . to recover damages for . . . injury to person . . . if the fault attributable to the claimant was not greater than the combined fault of [all tortfeasors]."[104] Thus, under this statute, if a plaintiff is found to be more than 50% at fault, he is precluded from any recovery.

5. Based on the Findings of Fact set forth above, Mr. Short has proven that the United States or its agents owed a duty of care to Mr. Short to exercise that degree of care, knowledge and skill ordinarily possessed and exercised by the average provider of medical services for patients at an outpatient clinic.

6. Based on the Findings of Fact set forth above, Mr. Short has failed to prove that the government breached that duty of care on December 18, 2007.

7. Based on the Findings of Fact set forth above, even if PA Keene had breached the duty of care to Mr. Short on December 18, 2007, Mr. Short has failed to prove that there was a resulting harm to Mr. Short. Specifically, given the location of Mr. Short's tumor, had a digital rectal exam been performed on that date, it most likely would have been negative, just as it was in March 2009. And, had a more thorough history been taken on December 18, 2007, this Court was persuaded by the uncontradicted testimony of Dr. Whiting that there was nothing in that history that would have indicated

---

[103] *Son*, 244 P.3d at 841 (quoting *Moser v. Mark*, 195 P.3d 424, 426 (Or. Ct. App. 2008)).

[104] Or. Rev. Stat. § 31.600.

3:10-cv-00248-SLG, *Short v. USA*
Memorandum of Decision
Page 19 of 20

that colon cancer was a greater risk for Mr. Short than an average patient his age. Nor does the evidence support a finding that had PA Keene palpated Mr. Short's abdomen at that time that any mass would have been identified, as no such mass was identified in August 2008 when Mr. Short visited another doctor. And the evidence does not support a finding that PA Keene lulled Mr. Short into complacency about his condition – for Mr. Short testified that he had rejected PA Keene's hemorrhoid diagnosis and instead diagnosed himself with Crohn's disease.

8. This Court further finds that even if PA Keene breached a duty of care to Mr. Short on December 18, 2007, and that resulted in harm to Mr. Short, Mr. Short's negligent conduct was greater than the fault of PA Keene, which precludes recovery under Oregon law. Specifically, Mr. Short did not seek out medical care for rectal bleeding or any related symptoms between December 2007 and March 2009 even though he had access to medical care during that time.

## CONCLUSION

For the foregoing reasons, this Court finds and concludes that judgment shall be entered for the Defendant.

Dated this 21st day of October, 2013.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE